UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MAURICE CHRISTOPHER CHIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-13110-TSH |
| | ) | |
| GARDA CL NEW ENGLAND, INC., | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION REGARDING
DEFENDANT'S RENEWED SPECIAL MOTION TO DISMISS
AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 63, 66)

ROBERTSON, U.S.M.J.

Plaintiff Maurice Christopher Chin ("Chin" or "Plaintiff") alleges that Defendant Garda

CL New England, Inc. ("Garda" or "Defendant") falsely accused him of a number of thefts that

occurred while he was an employee of Garda, an armored car company, and maliciously

instituted and maintained criminal charges against him in connection with the thefts without

probable cause. Chin asserts claims against Defendant for negligence (First Count), defamation

(Second Count), negligent infliction of emotional distress (Third Count), and malicious

prosecution (Fourth Count) (Dkt. No. 1-1).

Shortly after removing the case from Massachusetts state court, where Plaintiff initiated

it, Defendant filed a special motion to dismiss under Mass. Gen. Laws ch. 231, § 59H, the so-

called "anti-SLAPP" statute (Dkt. No. 8), which the court (Ponsor, J.) denied without prejudice

in order to permit Chin to conduct discovery as contemplated by the statute (Dkt. No. 24).

Discovery is now complete, and Defendant has filed a renewed special motion to dismiss (Dkt.

No. 66; *see also* Dkt. Nos. 67, 88), as well as a motion for summary judgment on all counts of

Chin's complaint (Dkt. No. 63; *see also* Dkt. Nos. 64-65, 83-84). Chin opposes both motions

(Dkt. Nos. 74-76; *see also* Dkt. Nos. 77-78). The court has considered all of the pleadings and heard the parties at oral argument (Dkt. No. 92) and, for the reasons set forth herein, recommends that Defendant's special motion to dismiss be DENIED and Defendant's motion for summary judgment be GRANTED.

## I.   FACTS[1]

On December 20, 2012, 29 small bags of money arrived at the Springfield, Massachusetts branch of Garda ("Garda Springfield"), an armored car company, where the bags were counted and placed inside a large, heavy gauge bag called a "clearing bag," which was then placed inside the branch's vault (DF 1, 5, 6-9). The following day, December 21, 2012, Chin and Jose Garcia, both employees of Garda, took possession of the clearing bag for delivery to a Loomis facility in Boylston, Massachusetts ("Loomis Boylston") (DF 1, 4, 10). Chin, as the driver, and Garcia, as the messenger, were normally responsible for the "Needham shuttle" route, which started at Garda Springfield and then made stops at a Brink's facility and a jeweler, both also located in Springfield, Loomis Boylston, and a Garda branch in Needham, Massachusetts ("Garda Needham"), before returning to Garda Springfield (DF 1, 4-5). The armored truck used for the Needham shuttle has a sealed door between the cab and the storage area and a rear or side door

---

[1] The facts are drawn from Defendant's statement of undisputed material facts in support of Defendant's motion for summary judgment ("DF") (Dkt. No. 65), Plaintiff's statement of disputed and undisputed facts ("PF") (Dkt. No. 77), and Defendant's response to Plaintiff's statement of undisputed facts ("DR") (Dkt. No. 84), to the extent that they are supported – and as they are elucidated – by the material in the summary judgment record. The court also takes notice of the docket and certain orders of the Hampden County Superior Court in the criminal proceeding brought against Chin in connection with the alleged thefts, *Commonwealth v. Chin*, Hampden Cty. Mass. Sup. Ct. Dkt. No. 1379CR00823. *See United States v. Florentino*, 385 F.3d 60, 65 (1st Cir. 2004), *vacated on other grounds*, 544 U.S. 1058 (2005) (noting that courts are "entitled to take notice of the records of relevant court proceedings"). For purposes of the Defendant's motion for summary judgment, the facts are construed in the light most favorable to Plaintiff, the non-moving party, meaning that where Plaintiff has disputed the accuracy of a fact Defendant included, the court includes the alternative offered by Plaintiff, provided the assertion is adequately supported by the material in the record.

to the storage area, which the driver's key cannot open (PF 15-16; DR 15-16). When Chin and

Garcia delivered the clearing bag in question to Loomis Boylston on December 21, 2012, it

contained only 24 smaller bags of money, not 29 (DF 11; PF 30). The five missing bags

contained a total of $76,000.00 in cash (DF 12; PF 30). Garcia promptly notified Melvin Diaz,

the Garda Springfield night vault manager, that the bags were missing from the delivery to

Loomis Boylston (PF 31). The night vault manager is responsible for looking up manifests on

missing bags to see who signed for them and turning that research over to the branch manager,

but Diaz never notified Gary Holland, Garda Springfield's branch manager, of the five missing

bags (DF 2; PF 32-33; DR 32-33).

Nearly one month later, on January 14, 2013, Garda client support notified Holland that

two Garda clients were reporting that cash Garda had picked up from them on December 20,

2012 was never deposited in their banks and was missing, and Holland undertook to look into the

matter (DF 6-7; PF 34-35; DR 34-35). Holland first confirmed that the money had been picked

up from the clients and delivered to Garda Springfield (DF 7; PF 35; DR 35). Holland then

watched Garda's surveillance video of the Springfield vault from December 20 to December 21,

2012; according to Holland, the video showed the 29 small bags of money arriving at Garda

Springfield, being counted, and being sealed into the clearing bag, which was then placed inside

Garda Springfield's vault, where it sat untouched overnight until it was signed over to Chin and

Garcia the following morning (DF 8-10; PF 35; DR 35).[2] Finally, Holland reviewed the

_____

[2] Chin disputes that the bags of money remained untouched in the vault, asserting that the vault video tape is the only proof of whether the bags remained untouched, and the video tape was not preserved (PF 1). This is incorrect. Holland's testimony that he watched the video, and the money was not touched is evidence, as is the corroborating testimony, which will be discussed *infra*, of two additional witnesses that they watched the video, and the money was not touched (DF 15). Additionally, there is evidence that a Springfield Police Department ("SPD") officer watched the video and swore out complaints against Garcia and Chin thereafter, from which the only reasonable inference is that the money was not tampered with overnight (DF 35, 39). On

manifest for the December 21, 2012 delivery to Loomis Boylston, which showed only 24 bags of money being delivered, not 29, with the five missing bags containing $76,000.00 in cash (DF 11-12).  Having completed his review, Holland filled out a Security Incident Report ("SIR") about the loss and submitted it to Garda corporate security (DF 13).

Garda security investigators Michael Kelly and Michael Zanatta were assigned to investigate the loss (DF 14).  Both Kelly and Zanatta reviewed Garda Springfield's surveillance video; both maintain that it revealed the same sequence of events as Holland reported, i.e. that on December 20, 2012, 29 small bags of money were sealed into a clearing bag, and the clearing bag was placed inside the Garda Springfield vault overnight, where it remained untouched until it was signed over to Chin and Garcia the following morning (DF 15; PF 40-42; DR 40-42).  Zanatta secured a video of the money being counted and the small bags placed inside of the clearing bag (PF 44; DR 44).  He did not secure a video of the overnight surveillance of the vault (PF 45; DR 45).  At some point – it is unclear exactly when – Loomis Boylston permitted Kelly to watch the portion of its surveillance video in which Garda handed the clearing bag over to Loomis with only 24 bags (DF 21; PF 86-88; DR 86-88).  Kelly advised Loomis personnel that they should expect a follow-up from the SPD about securing the video for potential criminal proceedings (DF 22).

On January 18, 2013, Kelly and Zanatta went to Garda Springfield, where they separately interviewed Chin and Garcia about the loss and obtained a written statement from each of them (DF 16, 18-19; PF 39, 63, 75; DR 39, 63, 75).  Both Chin and Garcia denied any involvement in or knowledge about the missing bags (DF 18-19).  During Chin's interview, for which Holland was present, Kelly or Zanatta told Chin that if he confessed and signed a piece of paper saying

the other hand, there is no evidence in the record that the money was touched while it sat in the vault overnight.

who took the money, he would not be prosecuted (PF 75-76; DR 76). Kelly or Zanatta also told Chin that since neither he nor Garcia admitted to taking the money, they would have to file a police report (PF 77; DR 77). At the end of Chin's interview, he was told to leave and not come back (PF 2).[3] Later that same day, Chin purchased a ticket for a flight to Jamaica leaving on January 24, 2013 (DF 40; PF 175; DR 175).[4]

Holland interviewed Diaz, who also denied taking any of the money (DF 19). While neither Kelly nor Zanatta could recall interviewing Diaz or taking a statement from him, Chin recalled that they interviewed Diaz after interviewing Garcia and before interviewing him (PF 63-65, DR 63-65). Also, Kelly reported to Vincent Modarelli of Garda (and later to the Grand Jury) that he met with Diaz, and he attached to an email a handwritten statement dated January 18, 2013, which starts with "I Melvin Diaz …" (PF 65; DR 65).

Later in the day on January 18, 2013, Kelly and Zanatta went to the SPD, where they met with Lieutenant Maurice Kearney ("Lt. Kearney"), to report the loss (DF 24-25; PF 89; DR 89). Kelly and Zanatta advised Lt. Kearney that Chin and Garcia had been the driver and messenger, respectively, on the truck from which the money had gone missing (DF 25). They provided him with supporting paperwork, including Chin's and Garcia's handwritten statements, but not Diaz's, and a copy of the portion of Garda's surveillance video showing the 29 bags of money arriving at Garda Springfield, being counted, and being placed into the clearing bag (DF 26; PF 90-91, 93; DR 90-91, 93). Kelly instructed Lt. Kearney that there were two videos to collect – one at Garda Springfield and the other at Loomis Boylston (PF 106; DR 106). Regarding the

---

[3] Chin maintains that his employment was terminated at this point, while Defendant maintains that he was not terminated until August 5, 2013 (DF 59).
[4] Chin had previously purchased a ticket to fly to Jamaica departing on February 7, 2012, but changed his travel plans to leave earlier due to the death of his aunt and his termination from Garda (PF 174-75; DR 175).

latter video, Kelly advised Lt. Kearney that he needed to summon the video from Loomis Boylston as Loomis Boylston would not release it to Garda (PF 107; DR 107). There is no evidence that Kelly or Zanatta asked the SPD to bring criminal charges against Chin (DF 28).[5] Kelly told Lt. Kearney that he believed Chin and Garcia were responsible for the theft (PF 4, 92). Once Garda security turns a matter over to the police, it discontinues its investigation and its work thereafter is limited to assisting the police if requested to do so (DF 29).

Several days later, on January 21, 2013, Holland met with Lt. Kearney and provided him with a written statement that he had prepared that day concerning what he had learned about the December 21, 2012 loss (DF 31-32; PF 108; DR 108). There is no evidence that Holland asked the SPD to bring criminal charges against Chin (DF 34).[6] Lt. Kearney went to Garda Springfield to watch the overnight surveillance video of the vault and requested a copy from Holland, who directed him to Kelly and Zanatta (DF 35; PF 104; DR 104). Holland did not request that anyone at Garda preserve the video (PF 57; DR 57). Later that same day, Lt. Kearney filed a criminal complaint for the loss and requested and obtained an arrest warrant for Chin (DF 39; PF 114; DR 114).

Chin left for Jamaica the next day, January 24, 2013 (DF 40). While Chin was in Jamaica, his family contacted him and told him he was on the news and was a wanted man (PF 176; DR 176). Chin googled his name and saw an internet news article about a theft from Garda with his picture (PF 177; DR 177). The article is dated February 7, 2013, and quotes SPD Sergeant John Delaney, but no one from Garda (PF 177; DR 177). The story was on Channel 4

---

[5] Plaintiff claims to dispute this fact, but he cites to no evidence in the summary judgment record that Kelly or Zanatta asked the SPD to bring criminal charges against Chin (PF 4).
[6] Again, Plaintiff claims to dispute this fact, but he cites to no evidence in the summary judgment record that Holland asked the SPD to bring criminal charges against Chin (PF 6).

News, Facebook, Instagram, and MassLive (PF 178; DR 178).  There is no evidence in the record as to how the press obtained Chin's picture.

On February 8, 2013, Holland passed along information to Kelly, who, in turn, notified the SPD, regarding additional losses from the Needham shuttle route occurring on September 17, 2012 and January 2 and 3, 2013 (DF 42-43; PF 116, 122; DR 116, 122).  Because the matter had already been turned over to the SPD, Kelly did not conduct any further investigation into these losses (DF 44; PF 117-19; DR 117-19).   On February 15, 2013, Holland gave a second written statement to the SPD regarding the September 17, 2012 and January 2, 2013 losses (DF 46).  He reported that Chin was on the Needham shuttle on both dates (DF 46).  Six days later, on February 21, 2013, Kelly sent Lt. Kearney an email informing him of the January 3, 2013 loss from the Needham shuttle truck (DF 47).  Kelly informed Lt. Kearney that Chin and another Garda employee, Lawrence Caragnano, were on the truck for that route (DF 48).  Kelly asked Lt. Kearney to add this loss to the SPD investigation (DF 48).  Complaints issued against Chin for larceny over $250 in violation of Mass. Gen. Laws ch. 266, § 30 (1) and possession of a firearm in the commission of a felony in violation of Mass. Gen. Laws ch. 265, § 18B in connection with the September 17, 2012 and January 2, 2013 losses (PF 131; DR 131).

Chin returned to the United States the day his grandmother died, March 25, 2013 (PF 182).  He was taken into custody at JFK airport, where he was held in the airport jail, and was later taken to the Queens jail for one week and then to Ryker's Island for three weeks before he was extradited to Massachusetts (PF 183-85; DR 183-85).  Once he was back in Massachusetts, Chin was held at the Hampden County House of Correction for three months, until he was released on house arrest (PF 186; DR 186).  While on house arrest, Chin had to wear an electronic monitoring bracelet ("ELMO") around his ankle (PF 187-88; DR 187-88).  He was

embarrassed about having to wear the ELMO, he could not leave his home to watch his children play sports, and he had to turn down potential work (PF 188-89; DR 188-89).

The District Attorney brought a case against Chin before a Grand Jury (DF 49). Holland, Kelly, and Lt. Kearney all testified (*id.*). On July 2, 2013, Chin and Garcia were each indicted for one count of larceny over $250 and one count of possession of a firearm in the commission of a felony in connection with the December 21, 2012 loss (DF 50-51; PF 132; DR 132; *see also Commonwealth v. Chin*, Hampden Cty. Mass. Sup. Ct. Dkt. No. 1379CR00823).

In November 2013, Chin and Garcia filed discovery motions in their criminal cases seeking numerous documents from Garda (DF 52; PF 134-36; DR 134-36). By that time, Kelly's employment with Garda had been terminated, based on the elimination of his position (DF 53; PF 130; DR 130). It fell to Zanatta to try to produce the items responsive to Chin's and Garcia's discovery requests (DF 54). Zanatta went through boxes that Kelly had left behind, but he was unable to locate the case file and some of the other requested information (DF 55; PF 133; DR 133). Zanatta provided copies of all of the responsive documents that he was able to find to the District Attorney's office (DF 56). Neither Zanatta, Kelly, nor Holland ever provided the SPD or the District Attorney's office with a copy of the Diaz statement (PF 91; DR 91). Nor did they provide the SPD or the District Attorney's office with a copy of the overnight surveillance video of the vault from December 20 through December 21, 2012; because Garda's internal video recordings are retained for only 90 days, it was no longer in existence (DF 38; PF 47; DR 47).[7]

---

[7] Zanatta testified that he tried to save the video, but was unable to do so because of its size (DR 99). He further testified that he requested help from Garda's Information Technology department, but they, too, were unable to save the video (*id.*).

Counsel for Chin filed two motions to dismiss in the criminal case (*Commonwealth v. Chin*, 1379CR00823, Hampden Cty, Mass. Sup. Ct. Dkt. at 19-20, 28)). The first motion sought dismissal pursuant to, *inter alia*, *Commonwealth v. McCarthy*, 430 N.E.2d 1195 (Mass. 1982), in which the Supreme Judicial Court ("SJC") held that "at the very least[, a] grand jury must hear sufficient evidence to establish the identity of the accused … and probable cause to arrest him," *id*. at 1197 (citations omitted), the latter of which requires "'reasonably trustworthy information … sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense,'" *id*. (quoting *Commonwealth v. Stevens*, 283 N.E.2d 673, 675 (Mass. 1972)). The court denied the motion, finding that there was probable cause to support the indictments:

> There was more than sufficient evidence from which the grand jurors could conclude that [Chin and Garcia] left the Springfield facility with, among other items, the clearance bag in question that contained twenty-nine separate deposit bags, totaling $127,132.79 in U.S. currency. Significantly, the grand jurors could also conclude that the defendants delivered to Loomis-Boylston on that same day, the clearance bag in question, but, at that point, the clearance bag contained only twenty-four separate deposit bags. Five specific deposit bags, all listed on the original manifest, were missing. Together those five bags contained $76,000. In a statement given during the investigation of this matter, the defendant, Jose Garcia, wrote that, at [Diaz's] urging, he did not report the five bags were missing to [Holland].
>
> ….
>
> [T]he standard at this stage is a mild one. The case presented to the grand jury was entirely a circumstantial case. The points, expressly and inferentially, raised by [Chin and Garcia] in their motions, namely, that there was no direct evidence that the defendants stole the money and that the supervisors … suspiciously either failed to report or failed to discover the loss of $76,000 and have since been terminated from their employment by [Garda], point out weaknesses in the Commonwealth's case and constitute significant fodder for cross examination, but they do not render the presentation to the grand jury insufficient.

> The quantum of evidence required to indict and commence
> prosecution is considerably less exacting than that required of the
> petit jury that adjudicates guilt.  When considering the sufficiency
> of the evidence to sustain a grand jury indictment, the court need
> not determine that the evidence would allow a reasonable person to
> find that the defendants committed the criminal conduct beyond a
> reasonable doubt; rather, the court must only find "the evidence
> sufficient for a grand jury to find probable cause that the crime
> charged has been committed by these defendants."
> *Commonwealth v. Levesque*, 766 N.E.2d 50, 59 (Mass. 2002).
> This the Commonwealth did.

*Commonwealth v. Chin*, 1379CR00823, Hampden Cty, Mass. Sup. Ct. Dkt. Nos. 13-823 & 13-824, Memorandum of Decision and Order on Defendant' Motions to Dismiss Indictments (Apr. 1, 2014) (Carey, J.).  On September 24, 2014, the court granted the second motion to dismiss based on Garda's failure to produce discovery (DF 58; PF 137; DR 137).  In its memorandum of decision and order, the court stated that "there was a loss of material evidence in th[e] case attributable to Garda's negligent and reckless failure to preserve and produce evidence deemed relevant by th[e] court," including documents setting forth the names and addresses of the Loomis-Boylston employees who received the bags in question; copies of all employee manuals and policies explaining the responsibilities of the driver, crew leader, and vault manager; video from Loomis-Boylston showing the process by which the bags were opened and transferred to Loomis-Boylston and Chin's and Garcia's reactions to the discovery of the missing money; the overnight video from the Garda vault; employee timesheets; all internal reports regarding Garda's investigation; documents regarding additional incidents where money was not accounted for; and employment records for Holland, Diaz, Kelly, Holland, and Gary Matos (Dkt. No. 78-1).

Chin instituted this action in state court on November 24, 2014, and Defendant removed it to this court on August 7, 2015 (Dkt. No. 1).  Chin claims that, as a result of the criminal

indictments, he suffers from depression and anxiety, for which he receives counseling and takes medication (PF 193-94; DR 194).

## II. DISCUSSION – THE RENEWED SPECIAL MOTION TO DISMISS

Massachusetts General Laws ch. 231, § 59H, popularly known as the "anti-SLAPP" law,[8] *Duracraft Corp. v. Holmes Prods. Corp.*, 691 N.E.2d 935, 938-39 (Mass. 1998), provides that:

> In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. …. The court shall grant such special motion, unless the party against whom such special motion is made shows … : (1) that the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

Mass. Gen. Laws ch. 231, § 59H. "The Legislature enacted the anti-SLAPP statute to counteract 'SLAPP' suits, defined broadly as 'lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'" *Blanchard v. Steward Carney Hosp., Inc.*, 75 N.E.3d 21, 29 (Mass. 2017) (quoting *Duracraft*, 691 N.E.2d at 939). "The main 'objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech.'" *Id.* (quoting *Duracraft*, 691 N.E.2d at 940). The anti-SLAPP statute established the special motion to dismiss as a procedural mechanism that can be brought prior to discovery to forestall such disfavored lawsuits early in the litigation and with a mandated award of attorney's fees and costs to

---

[8] "The acronym SLAPP stands for 'strategic litigation against public participation.'" *Maxwell v. AIG Domestic Claims, Inc.*, 893 N.E.2d 791, 793 n.2 (Mass. App. Ct. 2006) (quoting *Garebedian v. Westland*, 796 N.E.2d 439, 442 n.2 (Mass. App. Ct. 2003)).

successful special movants. *Id.* The First Circuit has confirmed that state anti-SLAPP statutes apply to state-law claims in federal court proceedings. *Godin v. Schencks*, 629 F.3d 79, 92 (1st Cir. 2010) (concluding that the Maine anti-SLAPP statute was substantive and, therefore, applied in federal court); *see also Steinmetz v. Coyle & Caron, Inc.*, No. 15-cv-13594-DJC, 2016 U.S. Dist. LEXIS 99631, at *8 (D. Mass. July 29, 2016) (extending the reasoning and conclusion of *Godin* to the Massachusetts anti-SLAPP statute).

In *Duracraft*, 691 N.E.2d at 943, the SJC established a two-part burden-shifting framework for special motions to dismiss brought under the anti-SLAPP statute, which it augmented quite recently, and after briefing and oral argument on Defendant Garda's special motion to dismiss, in *Blanchard*, 75 N.E.3d at 38-39. To invoke the statute's protection under the *Duracraft-Blanchard* framework, "the special movant need show, as a threshold matter, through pleadings and affidavits, that the claims against it are, in fact, 'based on' its petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities." *Office One, Inc. v. Lopez*, 769 N.E.2d 749, 757 (Mass. 2002). "The focus solely is on the conduct complained of, and if the only conduct complained of is petitioning activity, then there can be no other 'substantial basis' for the claim." *Id.* (citing *Fabre v. Walton*, 781 N.E.2d 780, 786 (Mass. 2002)). On the other hand, the fact that some petitioning activity is implicated will not be enough where "the root of the claims … is nonpetitioning." *Maxwell v. AIG Domestic Claims, Inc*., 893 N.E.2d 791, 799 (Mass. App. Ct. 2006) (quoting *Garebedian v. Westland*, 796 N.E.2d 439, 444 (Mass. App. Ct. 2003)). "In assessing the conduct complained of, a judge considers only the allegations that are relevant to the discrete causes of action brought." *477 Harrison Ave., LLC, v. Jace Boston, LLC*, 74 N.E.3d 1237, 1244 (Mass. 2017). At this initial stage, the motive behind the petitioning activity is irrelevant. *Id.* (citing *Fabre*, 781

N.E.2d at 785-86). "If the moving party fails to make such a showing, the special motion must be denied." *Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009) (citing *Wenger v. Aceto*, 883 N.E.2d 262, 266 (Mass. 2008)).

Where the moving party makes the requisite showing, the burden shifts to the nonmoving party to defeat the special motion to dismiss. *477 Harrison Ave.*, 74 N.E.3d at 1244. Following the SJC's decision in *Blanchard*, "the nonmoving party can now meet its second stage burden in two ways." *Id*. First, it may establish, "by a preponderance of the evidence, through the pleadings and affidavits, that the moving party's petitioning activities were 'devoid of any reasonable factual support or any arguable basis in law' and that the petitioning activities 'caused actual injury to the [nonmoving] party.'" *Benoit*, 908 N.E.2d at 718 (alteration in original) (quoting Mass. Gen. Laws. c. 231, § 59H). "The critical determination [at this point] is not whether the petitioning activity in question will be successful, but whether it contains any reasonable factual or legal merit at all." *Wenger*, 883 N.E.2d at 267. "The special movant's motivation for engaging in petitioning activity does not factor into whether their petitioning activity is illegitimate." *477 Harrison Ave.*, 74 N.E.3d at 1248 (footnote omitted) (citing *Wenger*, 883 N.E.2d at 268 (nonmoving party's contention that special movant filed criminal complaint with ulterior motive irrelevant because criminal complaint had reasonable basis in law)). "If these showings are made, by a preponderance of the evidence, then the special motion to dismiss must be denied." *Wenger*, 883 N.E.2d at 266.

If the non-moving party cannot make this showing, it "may [yet] meet its second-stage burden and defeat the special motion to dismiss by demonstrating in the alterative that each challenged claim does not give rise to a 'SLAPP' suit." *Blanchard*, 75 N.E.3d at 38.

> It may do so by demonstrating that each such claim was not
> primarily brought to chill the special movant's legitimate

13

petitioning activities. To make this showing, the nonmoving party must establish, such that the motion judge may conclude with fair assurance, that its primary motivating goal in bringing its claim, viewed in its entirety, was "not to interfere with and burden Defendant['s] … petition rights, but to seek damages for the personal harm to [it] from [the] Defendant['s] alleged … [legally transgressive] acts." *Sandholm v. Kuecker*, 962 N.E.2d 418, 434 (Ill. 2012). The nonmoving party must make this showing with respect to each such claim viewed as a whole. In applying this standard, the motion judge, in the exercise of sound discretion, is to assess the totality of the circumstances pertinent to the nonmoving party's asserted primary purpose in bringing its claim.

*Id*. at 38-39 (alterations in original) (footnote omitted). Factors that may be pertinent to this determination include "[t]he course and manner of proceedings, the pleadings filed, … affidavits 'stating the facts upon which the liability or defense is based,' …. [and] whether the nonmoving party's claim at issue is 'colorable or … worthy of being presented to and considered by the court.'" *Id*. at 39 (final alteration in original) (citations omitted). If the nonmoving party makes this alternative second-stage showing, the special motion to dismiss must be denied; if not, it must be allowed. *Id*.

Defendant has met its initial burden as to Chin's claims for malicious prosecution and defamation by showing that the claims are based on its petitioning activities alone and have no other substantial basis. "[R]eporting suspected criminal activity to the police and filing criminal complaints are activities the anti-SLAPP statute firmly protects." *Keegan v. Pellerin*, 920 N.E.2d 888, 891 (Mass. App. Ct. 2010) (citing *Wenger*, 883 N.E.2d at 267; *Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009)). This protection encompasses Chin's malicious prosecution claim, which is founded on Garda "prosecut[ing] criminal claims against Plaintiff" (Dkt. No. 1-1 at ¶ 39), and Chin's defamation claim, which is founded on Defendant providing the SPD with Chin's photograph (*id*. at 34). Defendant has not met its threshold burden with respect to Chin's claims for negligence and negligent infliction of emotional

14

distress, which are premised not only on Defendant's petitioning activity, but also on non-petitioning activity, specifically its allegedly deficient investigation and failure to preserve the results thereof. Thus, Defendant's renewed special motion to dismiss must be denied as to Chin's claims for negligence and negligent infliction of emotional distress.

As to Chin's claims for defamation and malicious prosecution, the burden shifts to Chin to demonstrate that Defendant's petitioning activity was devoid of any reasonable factual support or any arguable basis in law and caused him actual harm. Stated another way, Chin "must show that 'no reasonable person could conclude' that [Defendant's] report to the police was supported either in fact or in law." *Keegan*, 920 N.E.2d at 892 (quoting *North Am. Expositions Co. Ltd. P'ship v. Corcoran*, 898 N.E.2d 831, 843 (Mass. 2009). Chin cannot meet his burden if Defendant "had reasonable factual support" for its report to the SPD, even if the report turned out to have been erroneous. *Id.* (citing *Wenger*, 883 N.E.2d at 267). "Moreover, [Defendant] demonstrates 'reasonable factual support' if [its submissions] contain 'evidence that, if believed, would support a finding in' [its] favor." *Id.* (quoting *Benoit*, 908 N.E.2d at 719 n.7). Under this rubric, a judge faced with a special motion to dismiss "is to determine whether a finding in the defendant's favor would be warranted if she believed the contents of the defendant's proffer." *Id.* at 892 n.5. The judge does not take the next step and decide whether she actually believes the proffer because, "'[t]he question to be determined by a judge in deciding a special motion to dismiss is not which of the parties' pleadings and affidavits are entitled to be credited or accorded greater weight, but whether the nonmoving party has met its burden (by showing that the underlying petitioning activity by the moving party was devoid of any reasonable factual support or arguable basis in the law, and whether the activity caused actual injury to the nonmoving party).'" *Id.* (quoting *Benoit*, 908 N.E.2d at 719 n.7).

Chin has not met this difficult burden on this record.  *Id.* at 892 (noting that the non-movant's showing is "difficult to meet").  If one believes Defendant's submissions, its initial reports to the police on January 18, 2013 and January 21, 2013, were based on evidence that Chin and Garcia left Garda Springfield on December 21, 2012, with a clearing bag containing 29 deposit bags and that, when they delivered the clearing bag to Loomis Boylston, it contained only 24 deposit bags, with the five missing bags containing a total of $76,000, and that no one other than Chin and Garcia had access to the money during the time it went missing.  Under those circumstances, Chin cannot show that Defendant's reports to the police about the December 21, 2012 loss were devoid of any reasonable factual support.  Indeed, Lt. Kearney swore out a criminal complaint and a grand jury found probable cause to issue indictments against Chin in connection with this loss, a finding that was upheld by the Superior Court Judge following a motion to dismiss.  Nor does Chin make this showing as to any of Defendant's other reports to the police about the additional losses on September 17, 2012, or January 2 or 3, 2013.

Nonetheless, post-*Blanchard*, Chin's claims based on Defendant's legitimate petitioning activity can still survive the special motion to dismiss if he demonstrates that the challenged claim does not give rise to a "SLAPP" suit.  *Id.*, 75 N.E.3d at 38.  The court finds that Chin has met this alternative burden by demonstrating that he did not bring this claim to chill Defendant's legitimate petitioning activities.  Chin did not file his complaint in state court until November 24, 2014, a month after the indictments against him were dismissed.  Accordingly, there is no basis for inferring that Chin was motivated to deter Garda from participating in the prosecution against him and Garcia.  Moreover, Chin was no longer employed by Garda, so there is no basis for inferring that he was motivated to deter Garda from reporting other allegedly criminal activity by him or anyone else to the police.  Further, Chin has attested that he suffers from anxiety and

depression as a result of Defendant's legitimate petitioning activities, and these claims are plausible in view of his claim that Garda initiated his prosecution for thefts he did not commit. Under these circumstances, viewing the claims for malicious prosecution and defamation as a whole, the court cannot conclude that it is a "strategic litigation against public participation" suit. Therefore, the court recommends that Defendant's renewed special motion to dismiss be DENIED in its entirety.

III.    DISCUSSION – THE MOTION FOR SUMMARY JUDGMENT

A.  Summary Judgment Standard

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas–Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.,* 394 F.3d 40, 42 (1st Cir. 2005) (internal quotations and citation omitted). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the summary judgment context, "[a] factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990) (citations and internal quotation marks omitted)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (citing *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010)).

A party seeking summary judgment is responsible for identifying those portions of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "[t]he non-moving party bears the burden of placing at least one material fact into dispute." *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex*, 477 U.S. at 325). In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Padilla-García v. Guillermo Rodríguez*, 212 F.3d 69, 73 (1st Cir. 2000) (quoting *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998)).

B. <u>Analysis</u>

1. <u>First and Third Counts: Negligence and Negligent Infliction of Emotional Distress</u>

Before addressing the merits of Chin's claims for negligence and negligent infliction of emotional distress, the court must first determine whether the claims are barred by the exclusivity provision of the Workers' Compensation Act ("WCA"). *See* Mass. Gen. Laws ch. 152, § 24. The WCA provides that an employee waives the right to recover for personal injuries against an employer at common law if the WCA would otherwise provide compensation for personal injury. *Id.* "The WCA exclusivity provision stops a common law tort claim when 1) the plaintiff is an employee, 2) the plaintiff's condition is shown to be a 'personal injury' within the meaning of the WCA, and 3) 'the injury is shown to have arisen out of and in the course of employment.'" *Luthy v. Proulx*, 464 F. Supp. 2d 69, 76-77 (D. Mass. 2006) (quoting *Foley v. Polaroid Corp.*, 413 N.E.2d 711, 713-14 (Mass. 1980)).[9] "Massachusetts courts construe this

_____

[9] "The Act not only bars suits for negligence and intentional torts against an employer, but also against co-workers 'if the fellow employee also was acting in the course of employment.'"

provision broadly, and the waiver covers … negligent infliction of emotional distress ….” *Andresen v. Diorio*, 349 F.3d 8, 16 (1st Cir. 2003) (citing *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 146 n.7 (1st Cir. 1998)).

The question presented in this case is whether Chin was an employee at the time of the alleged negligence. To analyze that issue, the contours of the negligence claims must be delineated. A review of Chin's complaint reveals that his claim for negligence is premised on Defendant's alleged lack of reasonable care in making a criminal complaint against him, in allowing the video surveillance evidence to be destroyed, and in losing the investigative case file (Dkt. No. 1-1 at 10). Chin's negligent infliction of emotional distress claim does not add any acts of alleged negligence to this list (Dkt. No. 1-1 13).

“‘Generally, termination of employment extinguishes an employer's [WCA] liability for an injury to an employee which occurs after his discharge’ ….” *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 366 (D. Mass. 2002) (quoting *Larocque's Case*, 582 N.E.2d 959, 960 (Mass. App. Ct. 1991)). However, coverage has been extended in cases where “the post-termination activity is closely related to the employment, both in time and place.’” *Id.* (quoting *Larocque's Case*, 582 N.E.2d at 960). *See also Andresen*, 349 F.3d at 16 (“[U]nder Massachusetts case law, the statute covers broadly any injury that arises out of the employment relationship regardless of whether it occurs during the precise period of employment.” (citing *Grant*, 183 F. Supp. 2d at 366); *Chan v. Immunetics, Inc.*, No. 98-0388D, 1999 WL 218490, at *4 (Mass. Super. Apr. 7, 1999)). So, for example, courts have held the WCA exclusivity bar applicable to claims by workers for injuries sustained after they had been terminated, but while

*Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 365 (D. Mass. 2002) (quoting *Anzalone v. Mass. Bay Transp. Auth.*, 526 N.E.2d 246, 249 (Mass. 1988)). It is undisputed here that Kelly, Zanatta, and Holland were all acting within the scope of their employment at all times (DF 87; PRDF 87).

they were still on the premises of the employer winding up their employment. *See Grant*, 183 F. Supp. 2d at 366 (granting summary judgment to the Defendant on the plaintiff's claims for assault, battery, and infliction of emotional distress on WCA exclusivity grounds for injuries sustained when the plaintiff was being escorted to his cubicle to finish cleaning out his belongings after he had been terminated and had already taken some of his belongings home); *Zygmuntowicz v. Am. Steel & Wire Co. of N.J.*, 134 N.E. 385, 387 (Mass. 1922) (holding that the trial court erred in denying defendant's motion for a directed verdict on the plaintiff's count for assault based on injuries sustained while the plaintiff was on the premises of his employer objecting to his discharge); *Chan*, 1999 WL 218490, at *4 (dismissing claims for assault and battery for employee allegedly injured while being dragged out of the building after termination). On the other hand, the WCA exclusivity provision has been held not to apply to actions for injuries occurring later in time after the employee has been discharged and is no longer on the employer's premises. *See Grant*, 183 F. Supp. 2d at 367 (denying summary judgment for Defendant on the plaintiff's claim for intentional infliction of emotional distress based on corporate counsel's involvement in the plaintiff's prosecution and decision to continue to prosecute him); *Chan*, 1999 WL 218490, at *4 (denying motion to dismiss claims for infliction of emotional distress that allegedly occurred after the termination of the plaintiff's employment). *See also Larocque's Case*, 582 N.E.2d at 960 (holding worker's compensation benefits precluded for a claimant who sustained a heart attack two weeks after his discharge and in his home).

Viewing the facts in the light most favorable to Chin, he was terminated at the end of his interview on January 18, 2013. Thus, the WCA exclusivity bar would not apply to his claims sounding in negligence insofar as they are premised on events occurring after his interview,

including Defendant making a criminal complaint against him, allowing the video surveillance evidence to be destroyed, and losing its investigative case file. These events, even Kelly and Zanatta's meeting with Lt. Kearney that took place on the same day, were not in the course of wrapping up Chin's employment.

Turning to the merits, in a claim for negligent infliction of emotional distress, the plaintiff must demonstrate "1) negligence, 2) emotional distress, 3) causation, 4) physical harm manifested by objective symptomatology, and 5) that a reasonable person would have suffered emotional distress under the circumstances." *Taylor v. Swartwout*, 445 F. Supp. 2d 98, 105 (D. Mass. 2006) (citing *Conley v. Romeri*, 806 N.E.2d 933, 936 (Mass. App. Ct. 2004)). To prove negligence under Massachusetts law, a plaintiff must prove that 1) the defendant owed the plaintiff a duty of reasonable care; 2) the defendant breached this duty; 3) damage to the plaintiff resulted; and 4) the breach of the duty caused this damage. *Jupin v. Kask*, 849 N.E.2d 829, 835 (Mass. 2006). The first element, whether the defendant owes any duty to the plaintiff, is a question of law and, therefore, "grist for the summary judgment mill." *Brown v. United States*, 557 F.3d 1, 3 (1st Cir. 2009) (citing *Afarian v. Mass. Elec. Co.*, 866 N.E.2d 901, 905 (Mass. 2007) ("The existence of a legal duty is a question of law appropriate for resolution by summary judgment.")).

Chin alleges that it was Defendant's negligent investigation that led to its reports to the police and that its negligence included its failure to preserve the results of its investigation. Chin's claims sounding in negligence fail as a matter of law because Defendant owed no duty of care to Chin under these circumstances. The Massachusetts Appeals Court has recognized that "[a]n investigator's duty runs to the person or entity on whose behalf the investigation is conducted, not to the person being investigated." *O'Connell v. Bank of Boston*, 640 N.E.2d 513,

516 (Mass. App. Ct. 1994); *see also Maguire v. Commonwealth*, No. 00-P-1356, 2002 WL

31039719, at *1 (Mass. App. Ct. Sept. 12, 2002) (citing *O'Connell* for the proposition that the

defendant did not owe a duty of care to a terminated employee to conduct an adequate

investigation).  It is true that *O'Connell* goes on to state that:

> [a] slipshod or incomplete investigation, without more, is a
> disservice to the one who commissioned the investigation, not to
> its subject.  It is not until the investigation results in ill-founded
> allegations or charges of criminal conduct that the subject suffers
> cognizable injury.  At that point, the law makes remedies available
> – actions for defamation, malicious prosecution, tortious infliction
> of emotional distress – albeit under very circumscribed conditions.

*Id.*, 640 N.E.2d at 516.  However, the very next sentence makes clear that the potential causes of

action available in these "very circumscribed conditions" do not include negligence:  "[t]he

individual falsely accused is thus not remediless, but negligence alone does not make his or her

accuser liable."  *Id.  See also id.* ("Because an investigation that was merely negligent could not

entitle the plaintiff to recover, the judge properly decided that count added nothing to the count

of malicious prosecution.  The negligent investigation count was properly dismissed.")  Thus,

Defendant is entitled to summary judgment on Plaintiff's claims for negligence and negligent

infliction of emotional distress.

    2.  <u>Second Count:  Defamation</u>

Under Massachusetts law, "[d]efamation is the intentional or reckless publication,

without privilege to do so, of a false statement of fact which causes damage to the plaintiff's

reputation."  *Elicier v. Toys "R" Us, Inc.,* 130 F. Supp. 2d 307, 310 (D. Mass. 2001) (citing

*Correllas v. Viveiros,* 572 N.E.2d 7, 10 (Mass. 1991)).  *See also Flagg v. AliMed, Inc.*, 992

N.E.2d 354, 365 (Mass. 2013) ("In order to state a claim of defamation, a plaintiff must allege

facts indicating that (1) the defendant published a false statement regarding the plaintiff – that is,

the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss." (citing *White v. Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004)).  "[T]he imputation of a crime is defamatory per se, requiring no proof of special damages."  *Phelan v. May Dep't Stores Co.*, 819 N.E.2d 550, 554 (Mass. 2004) (citing *Lynch v. Lyons*, 20 N.E.2d 953, 955 (Mass. 1939)).

Chin does not identify any allegedly defamatory statements in his complaint or his opposition to Defendant's motion for summary judgment.  Rather, in both, Chin's defamation claim is predicated on Defendant allegedly providing his picture to the SPD (Dkt. No. 1-1 at 12 ("The Defendant caused the name and image of the Plaintiff to be promiscuously broadcast and did defame the Plaintiff …."); Dkt. No. 76 at 5 ("[O]n January 21, 2013, Gary Holland provided Mr. Chin's photograph to SPD where it was released to news outlets while branding him as the one 'responsible.'"), 14-15 ("In this case, plaintiff has provided evidence that Garda has defamed him in that it provided his likeness to the SPD thereby causing his name and image to be broadcast after distributing false information due to its own failure to investigate the reliability of its allegations ….").  There are at least two problems with Plaintiff's theory, both of which merit entry of summary judgment in Defendant's favor.

First, Plaintiff fails to produce admissible evidence that Defendant provided his picture to the SPD.  "As a general matter, only evidence that would be admissible at trial may be considered in connection with a motion for summary judgment."  *Barraford v. T & N Ltd.*, 988 F. Supp. 2d 81, 84 (D. Mass. 2013) (citing *Garside,* 895 F.2d at 49-51).  This includes hearsay evidence, which, if "'inadmissible at trial, cannot be considered on a motion for summary

judgment.'" *Selfridge v. Jama*, 172 F. Supp. 3d 397, 411 (D. Mass. 2016) (quoting *Garside*, 895 F.2d at 50). In support of the purported fact that Defendant provided Chin's photograph to the SPD, Chin relies on a police report dated January 21, 2013, which states, "Mr. Holland gave a statement to Lt. Kearney along with photos of Jose Garcia and Maurice Chin" (PF 113 (citing document at Dkt. No. 78-2 at 2)). Because Plaintiff offers the police report to prove the truth of the matter asserted therein, i.e. that Holland, in fact, provided SPD with a photograph of Chin, it is inadmissible hearsay.

Second, under Massachusetts law, statements to the police reporting a crime where no criminal action or judicial proceeding is yet contemplated or proposed are conditionally privileged. *Correllas,* 572 N.E.2d at 12 (citing *Seelig v. Harvard Coop. Soc'y*, 246 N.E.2d 642, 646 (Mass. 1969); *Galvin v. New York, New Haven & Hartford R.R. Co.*, 168 N.E.2d 262, 265 (Mass. 1960); *Pihl v. Morris*, 66 N.E.2d 804, 807 (Mass. 1946); *Pion v. Caron*, 129 N.E. 369, 370 (Mass. 1921); *Zinkfein v. W.T. Grant Co.*, 128 N.E. 24, 27 (Mass. 1920); *Robinson v. Van Auken*, 76 N.E. 601, 602 (Mass. 1906); *Brow v. Hathaway*, 13 Allen 239, 242-43 (Mass. 1867)). "A qualified or conditional privilege … immunizes a defendant from liability unless he or she acted with actual malice, *Tosti v. Ayik*, 437 N.E.2d 1062, 1065 (Mass. 1982), or unless there is 'unnecessary, unreasonable or excessive publication,' and the plaintiff establishes that the defendant published the defamatory information recklessly." *Mulgrew*, 574 N.E.2d at 391–92 (quoting *Bratt v. Int'l Bus. Machs. Corp.,* 467 N.E.2d 126, 129 (Mass. 1984)). The burden falls on the plaintiff to establish abuse of a conditional privilege. *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 47 (1st Cir. 2002) ("On motion for summary judgment, the plaintiff bears the burden of establishing abuse of the conditional privilege by clear and convincing evidence." (citing *Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.*, 929 F.2d 881, 889

(1st Cir. 1991)).  Even assuming the record contained admissible evidence that Holland provided the SPD with a photograph of Chin on January 21, 2013 (which it does not), Chin cannot show that Holland acted with actual malice, *Tosti*, 437 N.E.2d at 1065, or published the defamatory statements recklessly and engaged in unnecessary, unreasonable, or excessive publication. *Mulgrew*, 574 N.E.2d at 391–92.

Under Massachusetts law, malice exists "when the 'defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive.'" *Dragonas v. Sch. Comm. of Melrose*, 833 N.E.2d 679, 687 (Mass. App. Ct. 2005) (quoting *Dexter's Hearthside Rest., Inc. v. Whitehall Co.*, 508 N.E.2d 113, 117 (Mass. App. Ct. 1987)).  Chin points to no evidence to suggest that Holland had an ulterior motive in providing his picture to the SPD.  Nor does Chin point to any evidence that Holland provided the picture to anyone other than the SPD, such that it could create a triable issue as to whether he engaged in unnecessary, unreasonable or excessive publication.  Plaintiff complains that his picture made its way to the press and was published in a February 7, 2013 article, but there is no evidence in the record of how the press obtained the picture, and the article quotes only an SPD officer, and no one from Garda.  Because Plaintiff has not met his burden of establishing abuse of the conditional privilege by clear and convincing evidence, Defendant is entitled to summary judgment on the second count of Chin's complaint for defamation.

3. <u>Fourth Count:  Malicious Prosecution</u>

Chin claims that Defendant maliciously prosecuted him.  To prevail on a malicious prosecution claim under Massachusetts law, a plaintiff must prove that the defendant, without probable cause and with malice, instituted criminal proceedings that terminated in the plaintiff's

favor. *Limone v. U.S.*, 579 F.3d 79, 89 (1st Cir. 2009)). *See also Correllas,* 572 N.E.2d at 10

("To prove malicious prosecution, [the plaintiff] must show that [the defendant] instituted

criminal proceedings against [the plaintiff] with malice and without probable cause and that

those proceedings terminated in favor of [the plaintiff]."). Because Chin fails to create a triable

issue as to three of these elements, summary judgment in Defendant's favor is appropriate.

      a. <u>Probable Cause</u>

      Want of probable cause is the essential ground of an action for malicious prosecution,

and the plaintiff has the burden of proof on the issue. *Lincoln v. Shea*, 277 N.E.2d 699, 702

(Mass. 1972) (citations omitted). Lack of probable cause must be "'affirmatively proved, and

may not be inferred from the existence of malice … or from the fact of acquittal or anything

else.'" *Id.* (alteration in original) (quoting *Higgins v. Pratt*, 56 N.E.2d 595, 598 (Mass. 1944)).

"Probable cause has been defined as 'such a state of facts in the mind of the defendant as would

lead a person of ordinary caution and prudence to believe, or entertain an honest and strong

suspicion, that the plaintiff has committed a crime.'" *Bliss v. Fisher*, 842 F. Supp. 2d 400, 403

(D. Mass. 2012) (quoting *Bednarz v. Bednarz*, 542 N.E.2d 300, 302 (Mass. App. Ct. 1989)).

"'The defendant's conduct must be adjudged by his honest and reasonable belief at the time …

rather than by what may turn out later to have been the actual state of things.'" *Lincoln*, 277

N.E.2d at 702 (footnote omitted) (quoting *Muniz v. Mehlman*, 99 N.E.2d 37, 41 (Mass. 1951)).

Whether the defendant acted reasonably depends on all of the facts of the case, *id.*, and the

defendant's duty is not to determine if there is a defense, but rather, whether there is probable

cause for a prosecution. *Higgins*, 56 N.E.2d at 598. "[W]hen the facts are fully established or

undisputed, probable cause becomes a question of law." *Keefe v. Johnson*, 24 N.E.2d 520, 523

(Mass. 1939) (citing *Bannon v. Auger*, 160 N.E. 255, 258 (Mass. 1928); *Griffin v. Dearborn*, 313, 96 N.E. 681, 682 (Mass. 1911); *Casavan v. Sage*, 87 N.E. 893, 894 (Mass. 1909)).

Applying this standard, Chin has not met his burden of showing that Defendant lacked probable cause. At the time of Kelly and Zanatta's meeting with Lt. Kearney on January 18, 2013 and Holland's meeting with Lt. Kearney on January 21, 2013, the available information showed that, on December 20, 2012, 29 deposit bags were placed into a clearing bag, whereupon it was sealed, placed inside the Garda Springfield vault, and sat untouched overnight. On December 21, 2012, the clearing bag was signed over to Chin and Garcia for delivery to Loomis Boylston, where, upon arrival, it was unsealed and found to have only 24 deposit bags, with the five missing bags containing $76,000. The only two people with access to the clearing bag during the time the money went missing were Chin and Garcia, and both denied any involvement in or knowledge about the theft. Even viewing these undisputed facts in the light most favorable to Plaintiff, Kelly, Zanatta, and Holland could "reasonably [have] believe[d], or entertain[ed] an honest and strong suspicion," *Bliss*, 842 F. Supp. 2d at 403, that Chin or Garcia, or both of them acting together, had stolen the money. Indeed, based on this evidence, Lt. Kearney swore out a criminal complaint against Chin, the Grand Jury indicted Chin and Garcia for the loss, and a Massachusetts Superior Court judge – in a well-reasoned memorandum and order – found that the indictment was supported by probable cause. *See Counter v. Healy*, No. 09-12144-RGS, 2010 WL 2802174, at *1 (D. Mass. July 13, 2010) (observing that a finding of probable cause by a district court judge or a grand jury can be considered as evidence on the issue of the existence of probable cause) (citing *Willis v. Gurry*, 116 N.E.2d 689 (Mass. 1954); *Perkins v. Spaulding*, 65 N.E. 72d, 72 (Mass. 1902)). Nor has Plaintiff met his burden of demonstrating a lack of

probable cause as to the other three losses, all of which occurred on the Needham shuttle at times when Plaintiff was acting as the driver and was one of only two people with access to the money.

Plaintiff relies on *Carroll v. Gillespie*, 436 N.E.2d 431 (Mass. App. Ct. 1982), for the proposition that "private persons are not at liberty to initiate criminal prosecutions precipitously, on the basis of information which is neither reasonably complete nor reliable." *Id*. at 436. The *Carroll* court's observation is premised on the notion that, in determining whether the defendant could reasonably believe, or entertain an honest and strong suspicion, that the plaintiff had committed a crime, there is an implicit question as to "whether it was reasonable for the defendant to have relied upon th[e] information [he had], given its quality, quantity, and the availability of additional information." *Id*. Plaintiff implies that additional information available to Defendant regarding other individuals having access to the vault should negate a finding of probable cause. The problem with Plaintiff's argument is that the evidence available to Defendant was that, regardless of who may or may not have had access to the vault, three individuals watched the vault video, which showed that no one touched the money between the time it was sealed in the clearing bag and placed inside the vault and when it was given to Chin and Garcia for delivery to Loomis Boylston. Plaintiff also brings into the record information about other thefts or losses from Garda Springfield, but fails to develop their relevance to the information available each time money went missing on the Needham shuttle.

### b. Instituted Criminal Proceedings

In broad brush, an individual may be said to have instituted criminal proceedings against another if he caused those proceedings to be initiated. *See Witham v. Gregory & Read Co.*, 137 N.E. 752, 752 (Mass. 1923); *Mason v. Jacot*, 127 N.E. 331, 333 (Mass. 1920); *Tangney v. Sullivan*, 39 N.E. 799, 799–800 (Mass. 1895). The paradigmatic example exists when a person formally swears out a criminal complaint against another person. *See, e.g., White v. Apsley Rubber Co.*, 80 N.E. 500, 501 (Mass.

1907).  But malicious prosecution is by no means restricted to this paradigm.  If an individual induces another person (say, a police officer or prosecutor) to lodge formal criminal charges, he may be held to have instituted the criminal proceedings.  *See, e.g., Jones v. Schein*, 103 N.E. 57, 58 (Mass. 1913); *Tangney*, 39 N.E. at 800.  So, too, if an individual either exercises a peculiar degree of control over the charging official or adamantly presses that official to bring a criminal complaint, he may be held responsible for the institution of the prosecution.  *See, e.g., Seelig*, 246 N.E.2d at 646; *Conway v. Smerling*, 635 N.E.2d 268, 271 (Mass. App. Ct. 1994).

*Limone*, 579 F.3d at 89.  On the other hand, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution."  *Correllas*, 572 N.E.2d at 10 (citing *Burnham v. Collateral Loan Co.*, 60 N.E. 617, 617-18 (Mass. 1901); *Ziemba v. Fo'cs'le, Inc.*, 475 N.E.2d 1223, 1225 (Mass. App. Ct. 1985)).

Applying this standard, Plaintiff has failed to create a triable issue as to whether Defendant instituted criminal proceedings.  Viewing the undisputed facts in the light most favorable to Chin, Kelly, Zanatta, and Holland simply transmitted information to Lt. Kearney, while Lt. Kearney used his own judgment to pursue the matter and apply for criminal complaints against Chin.  As Defendant points out, there is no evidence that Kelly, Zanatta, or Holland ever asked Lt. Kearney to prosecute Chin in connection with any of the losses or exerted any control over his decision to file criminal complaints against Chin or over the District Attorney's decision to present the case to the Grand Jury.  To the contrary, the uncontested evidence shows that Lt. Kearney did not file the first criminal complaint based simply on the Defendant's reports, but rather, he went to Garda Springfield to review the overnight surveillance video himself first.  Similarly, the District Attorney exercised independent judgment by seeking an indictment only relative to one of the losses.

For these reasons, Chin fails to create a triable issue as to the institution of criminal proceedings.

        c.  Malice

To show malice, a plaintiff must show that the defendant knew there was no probable cause and acted with malice. *Foley v. Polaroid Corp.*, 508 N.E.2d 72, 82 (Mass. 1987) (citing *Beecy v. Pucciarelli*, 441 N.E.2d 1035, 1038-39 (Mass. 1982)). Malice necessitates an improper motive, which "may be one of vexation, harassment, annoyance, or attempting to achieve an unlawful end or a lawful end through an unlawful means." *Beecy*, 441 N.E.2d at 1039 n.9. "Sometimes, the lack of probable cause is so obvious that an inference of malice is warranted." *Foley*, 508 N.E.2d at 82 (citing *Beecy*, 441 N.E.2d at 1039).

Here, Chin suggests that Defendant's improper motive was that it wanted the police to collect the money for them and cites *Carroll* for the proposition that this would represent an improper purpose. *Id*., 436 N.E.2d at 436. *Carroll* is distinguishable. In *Carroll*, the defendant was alleged to have reported the plaintiff to the police to recover a civil debt, unlike in the instant case where Defendant was the victim of theft.[10] Not surprisingly, Plaintiff does not cite to any cases holding that a defendant's desire for restitution through the criminal justice system from one who he has probable cause to believe has stolen from him is malicious.

For these reasons, Plaintiff fails to create a triable issue of fact as to the element of malice.

---

[10] Moreover, the *Carroll* court does not address the element of malice, but rather only the elements of probable cause and the institution of criminal proceedings.

IV.    CONCLUSION

For the reasons set forth herein, the undersigned recommends that Defendant's special

motion to dismiss be DENIED and Defendant's motion for summary judgement be GRANTED

as to all counts of Plaintiff's complaint.[11]

Dated: August 16, 2017                    /s/ Katherine A. Robertson
                                          KATHERINE A. ROBERTSON
                                          UNITED STATES MAGISTRATE JUDGE

---

[11] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.